IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
MIDLAND-ODESSA DIVISION

| | |
|---|---|
| OPTIMNET LLC,<br><br>       *Plaintiff*,<br><br>v.<br><br>AMAZON.COM SERVICES LLC and<br>AMAZON WEB SERVICES, INC.,<br>       *Defendants*. | Case No. 7:25-cv-00532<br><br>**Complaint for Patent Infringement**<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT FOR PATENT INFRINGEMENT

This is an action for patent infringement under the Patent Laws of the United States, 35 U.S.C. § 1 et seq., in which Plaintiff OptimNet LLC ("OptimNet") alleges as follows against Defendants Amazon.com Services LLC and Amazon Web Services, Inc. (collectively, "Amazon"):

## INTRODUCTION

1.      This complaint arises from Amazon's unlawful infringement of U.S. Patent Nos. 8,543,864 ("'864 patent"), 8,788,846 ("'846 patent"), 9,104,565 ("'565 patent"), and 9,112,934 ("'934 patent"), and (collectively, "Asserted Patents"). OptimNet is the exclusive licensee of the Asserted Patents.

2.      The Asserted Patents originate from the Electronics and Telecommunications Research Institute ("ETRI"), a non-profit, government-funded research institute in Daedeok, Korea. Among other areas of expertise, ETRI is one of the leading research institutes in the area of advanced communications, next-generation network infrastructure (including 5G/6G and integrated terrestrial/non-terrestrial networks), packet data networks, and convergence of wireless,

1

wireline, broadcast, and cloud systems.  ETRI has made significant contributions to industry, standards, and public research resources in these technological domains.  For example, in 2024 ETRI announced that it had contributed to 36 new international standards, published 29 standard-essential patent (SEP) contributions, secured 1,215 SEP grants, and taken on 18 new leadership positions in standards-development organizations such as 3GPP and ITU-T focused on next-generation communications.  *See, e.g.*, https://www.eurekalert.org/news-releases/1083472.

3. The Accused Instrumentalities include Amazon's Cloud Services, including Amazon Simple Storage Service ("S3"), Amazon Elastic Compute Cloud ("EC2"), Amazon Web Services, Inc.'s ("AWS") Nitro System, Amazon CloudFront, Amazon CloudWatch, and Amazon CloudWatch Xray (with Insights).  As detailed below, these Accused Instrumentalities are core to Amazon's Cloud Services, and Amazon reaps substantial revenues and competitive advantages from these Accused Instrumentalities and its infringement of the Asserted Patents.

**Amazon Elastic Compute Cloud ("EC2") and Nitro System**

4. For example, Amazon EC2 is a web service that provides secure, resizable compute capacity in the AWS cloud and is designed to make web-scale cloud computing easier by allowing customers to launch and manage virtual server instances, configure networking and security, and attach storage. *See, e.g.*, https://aws.amazon.com/ec2/; *see also* https://docs.aws.amazon.com/AWSEC2/latest/UserGuide/instance-types.html.  AWS describes Amazon EC2 as offering "the broadest and deepest compute platform," with over 750 instances and a choice of the latest processor, storage, networking, operating system, and purchase model so that customers can best match their infrastructure to their workload needs.  *See, e.g.*, https://aws.amazon.com/ec2/; *see also* https://aws.amazon.com/solutions/case-studies/arm-ec2;

https://aws.amazon.com/solutions/case-studies/elastic; https://aws.amazon.com/solutions/case-studies/techcom-securities-graviton-case-study.

5. The EC2 documentation states that each instance type offers different combinations of compute, memory, and storage capabilities, and that instance types are grouped into families so that customers can select the instance type and family that best fits the requirements of their applications. *See, e.g.*, https://docs.aws.amazon.com/AWSEC2/latest/UserGuide/instance-types.html. AWS also provides multiple purchase options for EC2—including On-Demand Instances, Savings Plans, Reserved Instances, and Spot Instances—so that customers can trade off flexibility and commitment against price, and AWS's Reserved Instances page notes that "there are five ways to pay for Amazon EC2 instances: On-Demand, Savings Plans, Reserved Instances, and Spot Instances," with additional options such as Dedicated Hosts for specific licensing and isolation needs. *See, e.g.*, https://aws.amazon.com/ec2/pricing/reserved-instances.

6. The AWS Nitro System is described by AWS as the underlying platform for modern EC2 instances, consisting of a collection of hardware and software building blocks (including specialized Nitro Cards for VPC, EBS, and local NVMe storage, a lightweight hypervisor, and dedicated security components) that offload many traditional virtualization functions—such as network, storage, and system management—from the host CPU to dedicated hardware. *See, e.g.*, https://aws.amazon.com/ec2/nitro; *see also* https://docs.aws.amazon.com/whitepapers/latest/security-design-of-aws-nitro-system/the-components-of-the-nitro-system.html; https://docs.aws.amazon.com/AWSEC2/latest/UserGuide/-ena-nitro-perf.html

7. AWS's own whitepaper on the security design of the Nitro System states that the Nitro System "enables what is effectively 'bare metal' performance" by running nearly all of the

virtualization functionality on Nitro cards instead of on the host system's main CPUs, and AWS's performance guidance explains that Nitro "eliminates virtualization overhead" and provides bare-metal-like capabilities for workloads that require full access to host hardware. *See, e.g.*, https://docs.aws.amazon.com/pdfs/whitepapers/latest/security-design-of-aws-nitro-system/security-design-of-aws-nitro-system.pdf; *see also* https://docs.aws.amazon.com/AWSEC2-/latest/UserGuide/ena-nitro-perf.html.

8.    The same security documentation notes that the Nitro System provides an enhanced security model by continuously monitoring and protecting instance hardware and firmware, offloading virtualization resources to dedicated hardware and software to minimize the attack surface, and locking down the security model to prohibit administrative access, thereby reducing the risk of human error or tampering. *Id*.

9.    Amazon reports EC2's revenue as part of its AWS segment, and Amazon's February 6, 2025 investor release states that AWS segment sales were $107.6 billion in 2024, with operating income rising to $68.6 billion, underscoring the central economic role of AWS infrastructure services in Amazon's overall business. *See, e.g.*, https://ir.aboutamazon.com/news-release/news-release-details/2025/Amazon-com-Announces-Fourth-Quarter-Results; *see also* https://s2.q4cdn.com/299287126/files/doc_financials/-          2025/ar/Amazon-2024-Annual-Report.pdf; https://www.exchange4media.com/digital-news/-amazon-records-18-growth-in-ad-revenue-140705.html.  Amazon's 2024 Annual Report further confirms that AWS sales grew 19% in 2024 compared to the prior year, driven primarily by increased customer usage, and describes AWS as a key contributor to the company's profitability. *See, e.g.*, https://s2.q4cdn.com/299287126/files/doc_financials/2025/ar/Amazon-2024-Annual-Report.pdf; *see also* https://www.theguardian.com/technology/2024/apr/30/amazon-sales-report-ai.

4

10.     Public case studies and technical blogs show that major Internet companies rely heavily on EC2 for their core services: for example, an AWS case study reports that Netflix, an online content provider with hundreds of millions of subscribers, "can support seamless global service by using Amazon Web Services" and that "AWS enables Netflix to quickly deploy thousands of servers and terabytes of storage within minutes" to power its worldwide streaming platform. *See, e.g.*, https://aws.amazon.com/solutions/case-studies/netflix-case-study. A separate Netflix case study and third-party analyses specify that Netflix uses Amazon EC2 for its computing resources to run its streaming service and perform data processing and analytics, and that Netflix's cloud infrastructure—including its microservices-based architecture and streaming workloads—is built on AWS services such as EC2, S3, and related components. *See, e.g.*, https://yanil.hashnode.dev/case-study-on-netflix-using-aws-services.

11.     Similarly, an AWS case study on Airbnb explains that Airbnb "uses 200 Amazon Elastic Compute Cloud (Amazon EC2) instances for its application, memcache, and search servers" to support its rapidly growing lodging marketplace, and notes that Airbnb uses additional AWS services such as Elastic Load Balancing and Amazon EMR to process and analyze tens of gigabytes of data daily. *See, e.g.*, https://aws.amazon.com/solutions/case-studies/airbnb-case-study.

12.     These sources collectively demonstrate that EC2, powered by the AWS Nitro System, is a foundational component of the production infrastructure and cost structure of some of the world's largest and most sophisticated online businesses.

### Amazon CloudFront

13.     With respect to Amazon CloudFront, Amazon CloudFront is a managed content delivery network ("CDN") service from AWS that accelerates the distribution of both static and

dynamic web content, including HTML pages, CSS stylesheets, JavaScript files, images, and other assets, to end users around the world.  *See, e.g.*,  https://aws.amazon.com/cloudfront.  Amazon explains that CloudFront delivers this content through a worldwide network of data centers called edge locations and that, when a user requests content served via CloudFront, the request is automatically routed to the edge location that provides the lowest latency so the content is delivered with the best possible performance.  *See, e.g.*, https://docs.aws.amazon.com/AmazonCloudFront/latest/DeveloperGuide/Introduction.htm.

14.    The CloudFront service is designed for high performance, security, and developer convenience, providing built-in data compression, support for TLS/HTTPS, and edge compute features, and AWS markets CloudFront as a CDN that can help customers "distribute [their] static and dynamic content quickly and reliably with high speed and low latency."  *See, e.g.*, https://aws.amazon.com/cloudfront;  *see    also*    https://builder.aws.com/-content/2wiE9Qj1dSjRMhxQ5DxHK0bd8tX/how-aws-cloudfront-accelerates-your-website. AWS documentation further notes that CloudFront can be used to deliver video-on-demand and live streaming video using HTTP-based origins and can be integrated with AWS Media Services to build cloud-based video workflows.  These capabilities allow customers to offload traffic from their origin servers, reduce page load and startup times for end users, and improve the scalability and resilience of web, API, and streaming applications.  *See, e.g.*, https://docs.aws.amazon.com/AmazonCloudFront/latest/DeveloperGuide/on-demand-streaming-video.html.

15.    Amazon describes CloudFront as a usage-based content delivery network in which customers are charged for data transferred from its edge locations and for HTTP/HTTPS requests served, and CloudFront's contribution is included within the AWS segment, which, as discussed

above, generated approximately US $107.6 billion in net sales in 2024. *See e.g.,* https://aws.amazon.com/pricing; *see also* https://s2.q4cdn.com/299287126/files/doc_financials/2024/q4/AMZN-Q4-2024-Earnings-Release.pdf.

16. Public case studies show that large consumer-facing services use CloudFront as an integral part of their production infrastructure. For example, an AWS case study explains that Instacart, a leading online grocery platform, uses Amazon CloudFront as part of its advertising and edge-services stack: Instacart first used CloudFront to deliver its ads with low latency and then "decided to use Amazon CloudFront for its service load balancers to strengthen its security posture and enhance performance," leveraging CloudFront's edge distribution for critical traffic. *See e.g.,* https://aws.amazon.com/solutions/case-studies/instacart-edge-services-case-study; *see also* https://medium.com/%40gayatrivalp/how-aws-helped-instacart-4d00886e00ab.

17. As another example, an AWS "re:Invent" session and related materials for Hulu describe how Hulu built a new live TV service and cloud DVR platform on AWS using Amazon CloudFront, Amazon S3, and Amazon Aurora, and external reporting confirms that Hulu chose AWS as the cloud provider for its launched streaming live TV service, demonstrating that CloudFront is used to deliver Hulu's streaming content. *See e.g.,* https://www.youtube.com/watch?v=US2x6CalT7Y.

18. These examples confirm that CloudFront is deeply embedded in the live and on-demand content delivery workflows of major online services and contributes materially to AWS's revenue and to the performance and economics of its customers' products.

**Amazon Simple Storage Service (S3)**

19.     With respect to Amazon S3, Amazon S3 is AWS's cloud object storage service that offers what AWS describes as "industry-leading scalability, data availability, security, and performance" for storing and retrieving any amount of data from anywhere on the web.  *See e.g.,* https://aws.amazon.com/s3/.  S3 is designed to store data as objects within buckets and can be used for data lakes, backups, media libraries, log archives, cloud-native applications, and mobile apps, with millions of customers across industries using it to store and manage arbitrary volumes of structured and unstructured data.  *Id.; see also* https://aws.amazon.com/s3/customers.

20.     AWS's S3 storage-class documentation explains that S3's architecture is designed to provide "11 nines" (99.999999999%) data durability and that S3 stores data redundantly across a minimum of three Availability Zones by default, providing built-in resilience against device failures and localized outages.  *See e.g.,* https://aws.amazon.com/s3/storage-classes.  Likewise, AWS's S3 customer page states that "Amazon S3 is the most secure, durable, and scalable storage to build your data lake" and that S3 "hosts tens of thousands of data lakes for customers such as Sysco, Bristol Myers Squibb, GE, and Siemens," which use S3 to securely scale and to discover business insights every minute.  *See e.g.,* https://aws.amazon.com/s3/customers; *see also* https://aws.amazon.com/s3.

21.     As discussed above, Amazon's AWS segment—which includes services such as Amazon S3—reported net sales of approximately US $107.6 billion in 2024, a year-over-year increase of about 19%.  *See e.g.,* https://ir.aboutamazon.com/news-release/news-release-details/2025/Amazon-com-Announces-Fourth-Quarter-Results.  Amazon S3's pricing model is publicly detailed and includes charges per gigabyte of storage, per request (such as PUT, GET, SELECT), and per data-transfer event, confirming that customers paying for large volumes of

storage and requests generate recurring value for Amazon. *See e.g.,* https://aws.amazon.com/s3/pricing.

22. AWS and third-party case studies show that S3 is a foundational component of the storage architecture for well-known Internet services. For example, an AWS case study for Airbnb explains that "Airbnb is also using Amazon Simple Storage Service (Amazon S3) to house backups and static files, including 10 terabytes of user pictures," which are central to Airbnb's listing pages. *See e.g.,* https://aws.amazon.com/solutions/case-studies/airbnb-case-study. The same case study notes that Airbnb uses S3 in combination with Amazon CloudWatch to monitor its server resources and EC2 assets. *Id.*

23. These disclosures show that S3 is not only technically central to data-lake and media-storage workloads but also economically significant for both AWS and its customers, who rely on S3 as their primary durable storage layer for critical business data.

### Amazon CloudWatch and AWS X-Ray

24. Amazon CloudWatch is AWS's monitoring and observability service for AWS resources and customer applications; AWS describes CloudWatch as a "monitoring and management service" that collects and tracks metrics, collects and monitors log files, sets alarms, and automatically reacts to changes in AWS resources. *See e.g.,* https://aws.amazon.com/cloudwatch. The CloudWatch product page explains that CloudWatch "connects metrics, logs, and traces to help you quickly understand relationships, spot performance bottlenecks, and uncover hidden dependencies," and notes that CloudWatch integrates with more than 70 AWS services to provide curated dashboards and unified views of resources and applications. *Id.*

25.    AWS documentation on the CloudWatch agent states that the CloudWatch agent can collect system-level metrics, logs, and traces from Amazon EC2 instances, on-premises servers, and containerized applications, so customers can monitor both infrastructure and custom application metrics beyond the basic monitoring provided by default.    *See e.g.,* https://docs.aws.amazon.com/AmazonCloudWatch/latest/monitoring/Install-CloudWatch-Agent.html.

26.    AWS X-Ray is AWS's distributed tracing service; AWS's X-Ray product page states that "AWS X-Ray helps you debug and analyze your microservices applications with request tracing so you can find the root cause of issues and performance bottlenecks," and explains that X-Ray generates a detailed service map by compiling data from AWS resources, allowing customers to determine bottlenecks and improve application performance.    *See e.g.,* https://aws.amazon.com/xray.

27.    X-Ray documentation notes that X-Ray works across a range of AWS compute environments—including serverless, containers, and Amazon EC2—and that traces can be correlated with CloudWatch metrics and logs for full-stack observability. *Id.; see also* https://aws.amazon.com/blogs/developer/new-analyze-and-debug-distributed-applications-interactively-using-aws-x-ray-analytics.    Likewise, AWS blogs on observability explain that CloudWatch and AWS X-Ray together provide full observability of logs, metrics, and traces for serverless and microservice-based applications and describe reference architectures where CloudWatch is used for metrics and logs, while X-Ray provides the distributed tracing layer. *See e.g.,* https://aws.amazon.com/blogs/mt/observability-using-native-amazon-cloudwatch-and-aws-x-ray-for-serverless-modern-applications.

28.    CloudWatch and X-Ray are billed according to usage (for metrics, logs, dashboards, and trace data) and their revenues are included in the AWS segment, which, as discussed above, generated about $107.6 billion in net sales and $68.6 billion in operating income in 2024, highlighting their contribution to AWS's highly profitable infrastructure and management-services business.  *See e.g.,* https://s2.q4cdn.com/299287126/files/doc_financials/2024/q4/AMZN-Q4-2024-Earnings-Release.pdf.

29.    Moreover, AWS customer stories show that CloudWatch is used as the monitoring hub for high-scale systems.  For example, an AWS Cloud Operations blog post titled "How Twitch monitors its services with Amazon CloudWatch" explains that Twitch, the leading live-streaming service owned by Amazon, "uses Amazon CloudWatch to monitor its business-critical services," emitting custom metrics and visualizing and alerting on predefined thresholds for these key metrics in order to handle the high volume of transactions processed by Twitch's services.  *See e.g.,* https://aws.amazon.com/blogs/mt/how-twitch-monitors-its-services-with-amazon-cloudwatch. Similarly, AWS's Airbnb case study states that "to monitor all of its server resources, Airbnb uses Amazon CloudWatch, which allows the company to easily supervise all of its Amazon EC2 assets" through the AWS Management Console, command-line tools, or web services APIs, and subsequent analyses of Airbnb's architecture describe CloudWatch as Airbnb's monitoring hub for EC2, databases, and other AWS services.  *See e.g.,* https://aws.amazon.com/solutions/case-studies/airbnb-case-study.

30.    These examples show that CloudWatch and AWS X-Ray are integral to the observability and ongoing operation of major Internet services and that Amazon derives recurring economic benefit from customers' reliance on these monitoring and tracing capabilities.

11

**PARTIES**

31.     Plaintiff OptimNet is a Texas limited liability company with its principal place of business at 102 N. College Ave 1038, Tyler, TX 75702.

32.     On information and belief, Defendant Amazon.com Services LLC is a Delaware limited liability company, with its principal place of business at 410 Terry Avenue North, Seattle, WA 98109. Amazon.com Services LLC may be served through its registered agent in Texas, Corporation Service Company dba CSC-Lawyers Incorporating Service Company at 211 7th Street, Suite 620, Austin, TX 78701.

33.     On information and belief, Amazon Web Services, Inc. is a Delaware corporation with a principal place of business at 410 Terry Ave. North, Seattle, WA 98109. Amazon Web Services, Inc. may be served through its registered agent in Texas, Corporation Service Company dba CSC-Lawyers Incorporating Service Company at 211 E. 7th Street, Suite 620, Austin, Texas 78701.

**JURISDICTION AND VENUE**

34.     This action arises under the patent laws of the United States, 35 U.S.C. § 1 et seq.

35.     This Court has original subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a).

36.     This Court has personal jurisdiction over Defendants in this action because Defendants have committed acts of infringement within this District giving rise to this action, have a regular and established place of business in this District, and have established minimum contacts with this forum such that the exercise of jurisdiction over Defendants would not offend traditional notions of fair play and substantial justice. Defendants, directly and/or through subsidiaries or intermediaries, conduct their business extensively throughout Texas, by shipping, distributing,

12

offering for sale, selling, and advertising their products and/or services in Texas and the Western District of Texas, regularly do business or solicit business, engage in other persistent courses of conduct, and/or derive substantial revenue from products and/or services provided to individuals in Texas.

37.    Each of Amazon.com Services LLC and Amazon Web Services, Inc. maintains regular and established places of business throughout Texas and in this District, including offices housing, on information and belief, hundreds of employees at The Domain in Austin, a fulfillment center in the Metric Center in Austin, and numerous hubs throughout Texas and this District.

38.    On information and belief, Amazon employs approximately 95,000 people in Texas. *See, e.g.* https://worldpopulationreview.com/state-rankings/amazon-employees-by-state.

39.    Venue as to each of Amazon.com Services LLC and Amazon Web Services, Inc. is proper in this District under 28 U.S.C. §§ 1391 and 1400(b). Each of Amazon.com Services LLC and Amazon Web Services, Inc. is registered to do business in Texas. Additionally, upon information and belief, each of Amazon.com Services LLC and Amazon Web Services, Inc. has transacted business in this District and has committed acts of direct and indirect infringement in this District by, among other things, making, using, offering to sell, selling, and importing products that infringe the Asserted Patents.

40.    Amazon, directly and/or through subsidiaries or intermediaries, has purposefully and voluntarily placed one or more products and/or services in the stream of commerce that practice the Asserted Patents with the intention and expectation that they will be purchased and used by consumers in the Western District of Texas.  These products and/or services have been and continue to be purchased and used in the Western District of Texas.

13

41.     AWS and its affiliates maintain regular and established places of business in the Western District of Texas and use servers and data centers in this District to provide the accused cloud services.  Public data center records show that AWS operates data centers labeled "Amazon AWS" at 7400 Potranco Road, 12807 Donop Road, and an AWS "Rockfish" facility designated "ALE061" at 11625 Old Corpus Christi Highway in San Antonio, Texas.  *See, e.g,* https://www.datacenters.com/amazon-aws-7400-potranco-rd;                    *see                    also* https://www.datacentermap.com/usa/texas/san-antonio/amazon-aws-sat-7400-potranco; https://www.datacentermap.com/c/amazon-aws;   https://www.datacenters.com/locations/united-states/texas/san-antonio.  These facilities are described as Amazon AWS data centers and are part of AWS's global cloud-computing infrastructure.

42.     AWS also maintains corporate offices and technical staff in Austin, Texas, including AWS offices at 11501 and 11815 Alterra Parkway, where AWS provides cloud consulting, support, and other professional services to Texas customers.  *See, e.g,* https://www.dnb.com/business-directory/company-profiles.amazon_web_services_inc.248f1b_-882aa161e062e27197200dd574.html;  *see  also*  https://web.torchnet.org/atb/Information-and-Technology-Services/Amazon-Web-Services-1946;   https://www.expressnews.com/business/_-local/article/Amazon-is-planning-to-build-a-data-center-on-the-15679690.php.     Amazon.com Services LLC also maintains regular and established places of business at the Amazon Tech Hub in Austin, as well as several fulfillment centers or distribution centers in this District.

43.     In addition, AWS operates an Annapurna Labs facility on the outskirts of Austin that AWS uses to design and test custom chips used in AWS compute instances.  *See, e.g,* https://www.aboutamazon.com/_news/aws/take-a-look-inside-the-lab-where-aws-makes-custom-chips.

44.    Upon information and belief, AWS uses the above-described data centers and offices in this District to host, develop, support, and deliver the accused AWS cloud services, including Amazon EC2 (built on the AWS Nitro System), Amazon S3, Amazon CloudFront, Amazon CloudWatch, and AWS X-Ray, to customers in Texas, including within the Western District of Texas. *See, e.g,* https://docs.aws.amazon.com/whitepapers/latest/security-design-of-aws-nitro-system/security-design-of-aws-nitro-system.html; *see also* https://www.clay.com/dossier/amazon-web-services-headquarters-office-locations; https://amazon.jobs/content/en/locations/united-states/texas/austin; https://www.dnb.com/business-directory/companyprofiles.amazon_web_services_inc.248f1b882aa161e062e2-7197200dd574.html; https://aws.amazon.com/about-aws/global-infrastructure/regions_az.

45.    Additionally, on information and belief, numerous customers of AWS, including Amazon.com Services LLC, Netflix, Airbnb, and Disney+, among others, use Amazon's infringing systems in this District to provide their streaming and other online services.

46.    Moreover, current and recent AWS job postings confirm that infringing conduct takes place in Austin.  For example, AWS has recently advertised Austin-based job openings for a System Development Engineer in Infrastructure Security (https://web.archive.org/web/20250603045501/https:/www.amazon.jobs/en/jobs/2965322/sys-devengineer-infrastructure-annapurna-labs; https://www.amazon.jobs/en/jobs/2975562/system-development-engineer-ii-infrastructure-security-annapurna-labs), a Hardware Engineer in ML Acceleration (https://www.amazon.jobs/en/jobs/2919834/hardware-engineer-ml-acceleration-annapurna-labs), a Hardware Development Engineer in Storage (https://www.linkedin.com/jobs/view/hardware-development-engineer-storage-aws-hardware-servicesat-amazon-web-services-aws-4082074937), and a Senior Hardware Development

Engineer, working on AWS EC2 (https://www.amazon.jobs/en/jobs/3012000/senior-hardware-development-engineer-hardwareengineering-services), which infringes the Asserted Patents.

**COUNT 1 – INFRINGEMENT OF THE '864 PATENT**

47.    OptimNet incorporates by reference each of the allegations in the foregoing paragraphs as if fully set forth herein and further alleges as follows:

48.    On September 24, 2013, the United States Patent and Trademark Office issued U.S. Patent No. 8,543,864, titled "Apparatus and Method of Performing Error Recovering Process in Asymmetric Clustering File System."

49.    OptimNet is the exclusive licensee of the '864 patent with all substantial rights in the '864 patent including, without limitation, the exclusive right to sublicense, sue for infringement, and collect all past, present, and future damages.

50.    The claims of the '864 patent were duly issued by the United States Patent and Trademark Office and are presumed by statute to be valid.

51.    The claims of the '864 patent are patent eligible under 35 U.S.C. § 101.

52.    The claims of the '864 patent are not directed to abstract ideas and recite technical solutions to technical problems related to e.g.:

> The present invention relates to an apparatus and method of performing an error recovery process in an asymmetric clustering file system, and more particularly, to an apparatus and method of distributively processing the recovery of a data error due to failure of a data server in an asymmetric clustering file system.

'864 patent, 1:19-23.

53.    The written description of the '864 patent describes in technical detail each limitation of the claims, allowing a skilled artisan to understand the scope of the claims and how

16

the nonconventional and non-generic combination of claim limitations is patently distinct from and improved upon what may have been considered conventional or generic in the art at the time of the invention.

54. Defendants have directly infringed (literally and equivalently) and induced others to infringe the '864 patent by making, using, selling, offering for sale, or importing products that infringe the claims of the '864 patent and by inducing others to infringe the claims of the '864 patent without a license or permission from OptimNet, such as for example inducing customers to use the infringing system.

55. Exhibit 1 is a true and correct copy of the '864 patent. Exhibit 2 provides a description of the Accused Instrumentalities and a chart showing an example of how they infringe at least one claim of the '864 patent, which OptimNet provides without the benefit of information about the Accused Instrumentalities obtained through discovery.

56. Defendants knowingly and intentionally induce and contribute to infringement of the '864 patent in violation of 35 U.S.C. §§ 271(b)-(c). For example, through at least the filing and service of this Complaint, Defendants have had knowledge of the '864 patent and the infringing nature of the Accused Instrumentalities. Despite this knowledge, Defendants instruct and encourage their customers to use the Accused Instrumentalities in an infringing manner. Defendants do so knowing and intending that their customers will commit these infringing acts. Defendants also continue to make, use, offer for sale, sell, and/or import the Accused Instrumentalities, despite their knowledge of the '864 patent, thereby specifically intending for and inducing their customers to infringe the '864 patent through the normal and customary use of the Accused Instrumentalities. On information and belief, these acts include providing information

and instructions on the use of the Accused Instrumentalities; providing information, education and instructions to their customers; and indemnifying patent infringement within the United States.

57. Defendants also knowingly and intentionally contribute to the infringement of the '864 patent by selling, offering for sale, or importing into the United States, the Accused Instrumentalities, knowing that the Accused Instrumentalities constitute a material part of the inventions claimed in the '864 patent, are especially made or adapted to infringe the '864 patent, and are not staple articles or commodities of commerce suitable for non-infringing use. Defendants have been, and currently are, contributorily infringing the '864 patent in violation of 35 U.S.C. §§ 271(c) and (f).

58. As discussed above, through at least the filing and service of this Complaint, Defendants have had knowledge of the '864 patent and the infringing nature of the Accused Instrumentalities. Thus, as of the date of the filing of this Complaint, Defendants have also known or has been willfully blind to the fact that making, using, offering to sell, and selling the Accused Instrumentalities to their customers would constitute willful infringement of the '864 patent.

59. By making, using, offering for sale, selling and/or importing into the United States the Accused Instrumentalities, Defendants have injured Plaintiff and are liable for infringement of the '864 patent pursuant to 35 U.S.C. § 271.

60. As a result of Defendants' infringement of the '864 patent, Plaintiff is entitled to monetary damages in an amount adequate to compensate for Defendants' infringement, but in no event less than a reasonable royalty for the use made of the invention by Defendants, together with interest and costs as fixed by the Court.

61. OptimNet's claims for damages are not limited under 35 U.S.C. § 287, at least because there are no unmarked patented articles subject to a duty to mark.

## COUNT 2 – INFRINGEMENT OF THE '846 PATENT

62.     OptimNet incorporates by reference each of the allegations in the foregoing paragraphs as if fully set forth herein and further alleges as follows:

63.     On July 22, 2014, the United States Patent and Trademark Office issued U.S. Patent No. 8,788,846, titled "Cloud Computing System and Cloud Server Managing Method Thereof."

64.     OptimNet is the exclusive licensee of the '846 patent with all substantial rights in the '846 patent including, without limitation, the exclusive right to sublicense, sue for infringement, and collect all past, present, and future damages.

65.     The claims of the '846 patent were duly issued by the United States Patent and Trademark Office and are presumed by statute to be valid.

66.     The claims of the '846 patent are patent eligible under 35 U.S.C. § 101.

67.     The claims of the '846 patent are not directed to abstract ideas and recite technical solutions to technical problems related to, e.g.:

19

Accordingly, example embodiments of the present invention are provided to substantially obviate one or more problems due to limitations and disadvantages of the related art.

Example embodiments of the present invention provide a cloud computing system which protects privacy.

Example embodiments of the present invention also provide a method of creating and executing a client code for protecting privacy.

Example embodiments of the present invention also provide a cloud server managing method which protects privacy.

In some example embodiments, a cloud computing system includes: a management server configured to manage a plurality of servers and distribute service resources, wherein, each of the servers corresponds to one of a secure server type and a general server type, and the secure server type of server decrypts an encrypted code provided from a client.

When a program including the encrypted code is received, the management server may request execution of the program from at least one of the servers and the secure server type of server, and the management server may receive a result, which is obtained by determining whether to enable decryption of the encrypted code included in the program, from a server which receives the program execution request.

'846 patent, 1:41-63.

68.    The written description of the '846 patent describes in technical detail each limitation of the claims, allowing a skilled artisan to understand the scope of the claims and how the nonconventional and non-generic combination of claim limitations is patently distinct from and improved upon what may have been considered conventional or generic in the art at the time of the invention.

69.    Defendants have directly infringed (literally and equivalently) and induced others to infringe the '846 patent by making, using, selling, offering for sale, or importing products that infringe the claims of the '846 patent and by inducing others to infringe the claims of the '846 patent without a license or permission from OptimNet, such as for example inducing customers to use the infringing system.

20

70.     Exhibit 3 is a true and correct copy of the '846 patent.  Exhibit 4 provides a description of the Accused Instrumentalities and a chart showing an example of how they infringe at least one claim of the '846 patent, which OptimNet provides without the benefit of information about the Accused Instrumentalities obtained through discovery.

71.     Defendants knowingly and intentionally induce and contribute to infringement of the '846 patent in violation of 35 U.S.C. §§ 271(b)-(c). For example, through at least the filing and service of this Complaint, Defendants have had knowledge of the '846 patent and the infringing nature of the Accused Instrumentalities.  Despite this knowledge, Defendants instruct and encourage their customers to use the Accused Instrumentalities in an infringing manner. Defendants do so knowing and intending that their customers will commit these infringing acts. Defendants also continue to make, use, offer for sale, sell, and/or import the Accused Instrumentalities, despite their knowledge of the '846 patent, thereby specifically intending for and inducing their customers to infringe the '846 patent through the normal and customary use of the Accused Instrumentalities.  On information and belief, these acts include providing information and instructions on the use of the Accused Instrumentalities; providing information, education and instructions to their customers; and indemnifying patent infringement within the United States.

72.     Defendants also knowingly and intentionally contribute to the infringement of the '846 patent by selling, offering for sale, or importing into the United States, the Accused Instrumentalities, knowing that the Accused Instrumentalities constitute a material part of the inventions claimed in the '846 patent, are especially made or adapted to infringe the '846 patent, and are not staple articles or commodities of commerce suitable for non-infringing use. Defendants have been, and currently are, contributorily infringing the '846 patent in violation of 35 U.S.C. §§ 271(c) and (f).

73.     As discussed above, through at least the filing and service of this Complaint, Defendants have had knowledge of the '846 patent and the infringing nature of the Accused Instrumentalities.  Thus, as of the date of the filing of this Complaint, Defendants have also known or has been willfully blind to the fact that making, using, offering to sell, and selling the Accused Instrumentalities to their customers would constitute willful infringement of the '846 patent.

74.     By making, using, offering for sale, selling and/or importing into the United States the Accused Instrumentalities, Defendants have injured Plaintiff and are liable for infringement of the '846 patent pursuant to 35 U.S.C. § 271.

75.     As a result of Defendants' infringement of the '846 patent, Plaintiff is entitled to monetary damages in an amount adequate to compensate for Defendants' infringement, but in no event less than a reasonable royalty for the use made of the invention by Defendants, together with interest and costs as fixed by the Court.

76.     OptimNet's claims for damages are not limited under 35 U.S.C. § 287, at least because there are no unmarked patented articles subject to a duty to mark.

### COUNT 3 – INFRINGEMENT OF THE '565 PATENT

77.     OptimNet incorporates by reference each of the allegations in the foregoing paragraphs as if fully set forth herein and further alleges as follows:

78.     On August 11, 2015, the United States Patent and Trademark Office issued U.S. Patent No. 9,104,565, titled "Fault Tracing System and Method for Remote Maintenance."

79.     OptimNet is the exclusive licensee of the '565 patent with all substantial rights in the '565 patent including, without limitation, the exclusive right to sublicense, sue for infringement, and collect all past, present, and future damages.

80. The claims of the '565 patent were duly issued by the United States Patent and Trademark Office and are presumed by statute to be valid.

81. The claims of the '565 patent are patent eligible under 35 U.S.C. § 101.

82. The claims of the '565 patent are not directed to abstract ideas and recite technical solutions to technical problems related to e.g.:

> The present invention relates to a fault tracing system and method for remote maintenance, and more particularly, to a fault tracing system and method for remote maintenance capable of accurately and effectively tracing a fault that has occurred in a home network using home network resource information and relationship information among resources for the purpose of remote maintenance in a home/building network environment.

'565 patent, 1:15-21.

83. The written description of the '565 patent describes in technical detail each limitation of the claims, allowing a skilled artisan to understand the scope of the claims and how the nonconventional and non-generic combination of claim limitations is patently distinct from and improved upon what may have been considered conventional or generic in the art at the time of the invention.

84. Defendants have directly infringed (literally and equivalently) and induced others to infringe the '565 patent by making, using, selling, offering for sale, or importing products that infringe the claims of the '565 patent and by inducing others to infringe the claims of the '565 patent without a license or permission from OptimNet, such as for example inducing customers to use the infringing system.

85. Exhibit 5 is a true and correct copy of the '565 patent. Exhibit 6 provides a description of the Accused Instrumentalities and a chart showing an example of how they infringe

at least one claim of the '565 patent, which OptimNet provides without the benefit of information about the Accused Instrumentalities obtained through discovery.

86.     Defendants knowingly and intentionally induce and contribute to infringement of the '565 patent in violation of 35 U.S.C. §§ 271(b)-(c). For example, through at least the filing and service of this Complaint, Defendants have had knowledge of the '565 patent and the infringing nature of the Accused Instrumentalities.   Despite this knowledge, Defendants instruct and encourage their customers to use the Accused Instrumentalities in an infringing manner. Defendants do so knowing and intending that their customers will commit these infringing acts. Defendants also continue to make, use, offer for sale, sell, and/or import the Accused Instrumentalities, despite their knowledge of the '565 patent, thereby specifically intending for and inducing their customers to infringe the '565 patent through the normal and customary use of the Accused Instrumentalities.   On information and belief, these acts include providing information and instructions on the use of the Accused Instrumentalities; providing information, education and instructions to their customers; and indemnifying patent infringement within the United States.

87.     Defendants also knowingly and intentionally contribute to the infringement of the '565 patent by selling, offering for sale, or importing into the United States, the Accused Instrumentalities, knowing that the Accused Instrumentalities constitute a material part of the inventions claimed in the '565 patent, are especially made or adapted to infringe the '565 patent, and are not staple articles or commodities of commerce suitable for non-infringing use. Defendants have been, and currently are, contributorily infringing the '565 patent in violation of 35 U.S.C. §§ 271(c) and (f).

88.     As discussed above, through at least the filing and service of this Complaint, Defendants have had knowledge of the '565 patent and the infringing nature of the Accused

24

Instrumentalities. Thus, as of the date of the filing of this Complaint, Defendants have also known or has been willfully blind to the fact that making, using, offering to sell, and selling the Accused Instrumentalities to their customers would constitute willful infringement of the '565 patent.

89. By making, using, offering for sale, selling and/or importing into the United States the Accused Instrumentalities, Defendants have injured Plaintiff and are liable for infringement of the '565 patent pursuant to 35 U.S.C. § 271.

90. As a result of Defendants' infringement of the '565 patent, Plaintiff is entitled to monetary damages in an amount adequate to compensate for Defendants' infringement, but in no event less than a reasonable royalty for the use made of the invention by Defendants, together with interest and costs as fixed by the Court.

91. OptimNet's claims for damages are not limited under 35 U.S.C. § 287, at least because there are no unmarked patented articles subject to a duty to mark.

## COUNT 4 – INFRINGEMENT OF THE '934 PATENT

92. OptimNet incorporates by reference each of the allegations in the foregoing paragraphs as if fully set forth herein and further alleges as follows:

93. On August 18, 2015, the United States Patent and Trademark Office issued U.S. Patent No. 9,112,934, titled "Apparatus and Method for Configuring On-Demand Content Delivering Overlay Network."

94. OptimNet is the exclusive licensee of the '934 patent with all substantial rights in the '934 patent including, without limitation, the exclusive right to sublicense, sue for infringement, and collect all past, present, and future damages.

95. The claims of the '934 patent were duly issued by the United States Patent and Trademark Office and are presumed by statute to be valid.

25

96.    The claims of the '934 patent are patent eligible under 35 U.S.C. § 101.

97.    The claims of the '934 patent are not directed to abstract ideas and recite technical solutions to technical problems related to e.g.:

> In one general aspect, there is provided an apparatus for managing a content delivery network to transmit media content to a user, including: a request receiver configured to receive a network configuration request and network configuration information, from a service provider that provides the content, wherein the network configuration information is needed to provide a service of the service provider; a resource manager configured to manage resource information including information about available resources required for configuring the network; and a controller configured to configure a content delivery overlay network for configuring the content delivery network, based on the resource information and the network configuration information.

'934 patent, 2:4-17.

98.    The written description of the '934 patent describes in technical detail each limitation of the claims, allowing a skilled artisan to understand the scope of the claims and how the nonconventional and non-generic combination of claim limitations is patently distinct from and improved upon what may have been considered conventional or generic in the art at the time of the invention.

99.    Defendants have directly infringed (literally and equivalently) and induced others to infringe the '934 patent by making, using, selling, offering for sale, or importing products that infringe the claims of the '934 patent and by inducing others to infringe the claims of the '934 patent without a license or permission from OptimNet, such as for example inducing customers to use the infringing system.

100.    Exhibit 7 is a true and correct copy of the '934 patent.  Exhibit 8 provides a description of the Accused Instrumentalities and a chart showing an example of how they infringe

26

at least one claim of the '934 patent, which OptimNet provides without the benefit of information about the Accused Instrumentalities obtained through discovery.

101. Defendants knowingly and intentionally induce and contribute to infringement of the '934 patent in violation of 35 U.S.C. §§ 271(b)-(c). For example, through at least the filing and service of this Complaint, Defendants have had knowledge of the '934 patent and the infringing nature of the Accused Instrumentalities. Despite this knowledge, Defendants instruct and encourage their customers to use the Accused Instrumentalities in an infringing manner. Defendants do so knowing and intending that their customers will commit these infringing acts. Defendants also continue to make, use, offer for sale, sell, and/or import the Accused Instrumentalities, despite their knowledge of the '934 patent, thereby specifically intending for and inducing their customers to infringe the '934 patent through the normal and customary use of the Accused Instrumentalities. On information and belief, these acts include providing information and instructions on the use of the Accused Instrumentalities; providing information, education and instructions to their customers; and indemnifying patent infringement within the United States.

102. Defendants also knowingly and intentionally contribute to the infringement of the '934 patent by selling, offering for sale, or importing into the United States, the Accused Instrumentalities, knowing that the Accused Instrumentalities constitute a material part of the inventions claimed in the '934 patent, are especially made or adapted to infringe the '934 patent, and are not staple articles or commodities of commerce suitable for non-infringing use. Defendants have been, and currently are, contributorily infringing the '934 patent in violation of 35 U.S.C. §§ 271(c) and (f).

103. As discussed above, through at least the filing and service of this Complaint, Defendants have had knowledge of the '934 patent and the infringing nature of the Accused

Instrumentalities. Thus, as of the date of the filing of this Complaint, Defendants have also known or has been willfully blind to the fact that making, using, offering to sell, and selling the Accused Instrumentalities to their customers would constitute willful infringement of the '934 patent.

104. By making, using, offering for sale, selling and/or importing into the United States the Accused Instrumentalities, Defendants have injured Plaintiff and are liable for infringement of the '934 patent pursuant to 35 U.S.C. § 271.

105. As a result of Defendants' infringement of the '934 patent, Plaintiff is entitled to monetary damages in an amount adequate to compensate for Defendants' infringement, but in no event less than a reasonable royalty for the use made of the invention by Defendants, together with interest and costs as fixed by the Court.

106. OptimNet's claims for damages are not limited under 35 U.S.C. § 287, at least because there are no unmarked patented articles subject to a duty to mark.

## JURY DEMAND

107. OptimNet demands a jury trial pursuant to Federal Rule of Civil Procedure 38.

## RELIEF REQUESTED

OptimNet prays for the following relief:

A. A judgment in favor of OptimNet that Defendants have infringed the Asserted Patents, and that the Asserted Patents are valid and enforceable;

B. A judgment and order requiring Defendants to pay OptimNet past and future damages arising out of Defendants' infringement of the Asserted Patents in an amount no less than a reasonable royalty, costs, expenses, and pre- and post-judgment interest, as provided under 35 U.S.C. § 284;

C.    A judgment and order requiring Defendants to provide an accounting and to pay supplemental damages to OptimNet, including, without limitation, pre-judgment and post-judgment interest;

D.    A judgment that Defendants' infringement is willful and enhanced damages and fees as a result of that willfulness under 35 U.S.C. § 284;

E.    A finding that this case is exceptional under 35 U.S.C. § 285, and an award of OptimNet's reasonable attorney's fees and costs; and

F.    Any and all other relief to which OptimNet may be entitled.

Dated:  November 17, 2025

Respectfully submitted,

*/s/ Dale Chang*
Dale Chang
CA State Bar No. 248657
Email: dchang@raklaw.com
Kristopher Davis
CA State Bar No. 329627
Email: kdavis@raklaw.com
Bradley Hyde
CA State Bar No. 301145
Email: bhyde@raklaw.com
**RUSS AUGUST & KABAT**
12424 Wilshire Blvd. 12th Floor
Los Angeles, CA 90025
Telephone: 310-826-7474

**ATTORNEYS FOR PLAINTIFF,
OptimNet LLC**